Memorandum of Decision
This is an action for the termination of parental rights of Marilyn A. and Jorge G., the biological parents of the minor child, Natalia G., born August 4, 1994. Natalia is now nearly four years of age and has been residing with her maternal aunt for nearly two years. This child has previously been found to be an uncared for and neglected child on March 7, 1997 (P.E. Wiese, J.). The petition was filed by the Commissioner of the Department of Children and Families ("DCF") on March 11, 1998. The case was assigned and tried over three days beginning June 12, 1998.
Both parents were represented by counsel and vigorously opposed the termination of their parental rights. The court finds that there is no proceeding pending in any other court affecting the custody of the child. The court has heard testimony from DCF social workers, the child's foster mother, a psychologist, drug counselors and a police officer. The court received into evidence social studies, court approved expectations signed by the parents, arrest and conviction records, and a visitation schedule and list of services provided. CT Page 7894
The court makes the following findings by clear and convincing evidence. The sociological history of the parents was presented in the form of testimony of the social workers and the social study (Exhibit #3). This social history was not convincingly challenged by the parents.
The case came to the attention of DCF for the fist time in the spring of 1995, on a referral from Natalia's pediatrician who was concerned about medical neglect of the child. Natalia was nine months old and had missed numerous medical visits and immunizations. Over the course of the next ten months the DCF social worker offered both of the parents numerous services including drug evaluation, including transportation and treatment, visiting nurses services. and a parent aide to assist them. The parents resisted DCF offers of services. The worker continued to make weekly visits after an application for temporary custody had been denied by the court.
During the summer and fall of 1995, the social worker continued to visit the various locations where this family resided. There were at least three moves during this period of time. The parents admitted the use of drugs. Marilyn, who was eighteen at the time, admitted to the use of marijuana and crack cocaine. While Jorge wasn't as forthcoming in his narrative, his conduct betrayed his use of drugs and was described by the social worker. She testified that maintaining contact with the parents was difficult. A parent aide involved with the parents terminated the case because of the parents lack of cooperation. During a home visit by the social worker on High Street, the worker entered the apartment. Both parents were there. People were passed out all over the place. Marilyn was in a back bedroom, beer bottles were all over, there was total filth on the floors, a $20 piece of crack and a joint were observed. The social worker said she spoke with Jorge. He wouldn't look at her, he wouldn't talk to her, he looked high, his eyes were glazed, ". . they both react the same way when they are high, sweating, nervous, hostile, angry, paranoid, eyes glazed. He wouldn't make eye contact." On an another occasion the worker observed a straw with what appeared to be cocaine residue, drug paraphernalia, a pipe and an exposed razor blade. The apartment was in great disarray.
The DCF worker prepared a service agreement (Respondent's Exhibit O) on May 1, 1995, requiring the mother to remain drug free, attend Wheeler Clinic Intake and Treatment programs, keep CT Page 7895 all medical appointments for the baby and to cooperate with agency service providers. The parents did not meet the terms of the agreement. As a consequence, in December 1995, the parents agreed to allow the paternal grandmother to take care of the child and that they would submit to drug evaluation and treatment. (Respondent's Exhibit P). They went for an evaluation but did not go to treatment. In June, 1996, DCF closed its file since the family was confirmed to be living in Springfield, Massachusetts.
On a chilly October 23, 1996, officer Brian West of the New Britain police department was sent to a boarded up, unoccupied, burned out funeral home in the city. The building had no heat or utilities. He found Jorge, Marilyn and the child, Natalia. The child was inappropriately dressed for the cold. The parties had been observed leaving the building. The officer testified that this was a high-crime, unofficial red-light district and that Marilyn had been observed in the presence of other people known to be prostitutes. Marilyn had previously admitted to the police officer that she had prostituted herself (Petitioner's Exhibits # 1 and 2). Natalia, who was then two, was observed to have mucous coming from her nose, she was shivering. DCF was contacted and the child was brought to the hospital. The parents were arrested for risk of injury to a minor. DCF sought an obtained an Order of Temporary Custody on October 25, 1996.
The testimony of various substance abuse counselors and the court appointed psychologist confirm that the mother of the child, Marilyn, is a poly-drug dependent person without visible means of support. The father, Jorge, in addition to his drug dependence, has a prodigious criminal record beginning in 1994 and continuing to the date of trial. He has multiple arrests and convictions; all appear to be drug related. (Petitioner's Exhibit 17).
At the time the child was first committed, each parent signed a document calling for them to perform certain "Expectations" in order for them to "improve your chances of regaining . . . guardianship of your child permanently."(Exhibit # 4). Neither parent has satisfactorily complied with the court approved expectations. The social workers offered appropriate, available and accessible services for treating the parent's substance abuse problems, for counseling, and for parental skills training. Neither parent fully attended nor successfully completed the offered programs. (See Exhibit # 3, pp 11-14) Most importantly, CT Page 7896 both parents have continued their substance abuse and the father has had subsequent involvement with the criminal justice system resulting in incarceration. Two years have elapsed since the child was placed in foster care and neither of the parents has made substantial gains in personal or parental rehabilitation. As recently as March 2, 1998, Marilyn was tested for drug abuse. The test confirmed that she was nineteen times above the cutoff, positive for the presence of cocaine. (Exhibit # 15). She has failed to successfully complete any drug rehabilitation program.
Jorge has recently been arrested and has applied for an alternate incarceration program for substance abusers. He has been evaluated and found to be drug dependent. As of the last day of trial, it was expected that Jorge would enter the Blue Hills residential drug treatment program on July 9, 1998. In June of 1997, he had tested positive "at highest level" for cocaine and heroin (Exhibit # 7). He has not successfully completed a drug rehabilitation program.
Neither parent has sufficiently demonstrated that in the preceding two years they have rehabilitated themselves to the point where the court could have any confidence in their remaining drug free. The child should not remain in temporary care indefinitely, nor can the child be returned to these biological parents. There has not been a showing that the parents have recovered from their substance abuse habits, and they continue, to this time, to be drug-dependent. A vigorous and continuous display of interest in the child's welfare, as well as a demonstrated display of the parent's own dedication to personal rehabilitation are basic tenets of fulfilling the parental role, necessary to the restoration of custody. Neither parent has demonstrated a commitment to remaining drug-free. Notwithstanding the continuing offer of programs for their rehabilitation, neither parent has demonstrated a commitment to recovery.
Considering the child's sense of time and need for a secure, safe and permanent environment, further delay in permanent placement is not warranted. Dr. Bruce Freedman, a court appointed psychologist who interviewed the parents, administered psychological tests to them and evaluated them with the child, concluded that termination of the parents rights was appropriate. (Exhibits #16 and #20). His testimony and reports are considered by the court to be sociologically accurate and psychologically appropriate. The court places great weight upon his factual and clinical findings. CT Page 7897
 Adjudication
With respect to the statutory grounds for termination of parental rights of the mother, Marilyn A., and the father, Jorge G., the court finds by clear and convincing evidence that this child has previously been adjudicated neglected and uncared for on March 7, 1996, and that since that date, the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes17a-112(c)(3)(B). The court finds that this ground has existed for more than one year.
 Mandatory Findings:
The court makes the following factual findings required by17a-112(e):
1) Appropriate and timely services were provided by the Department of Children and Families, including substance abuse and individual counseling, transportation assistance, and visitation coordination. These services were offered as early as April, 1995. The programs have included Lifeline, Wheeler clinic counseling, Hogar Crea and Catholic Family Services. Neither parent followed through with the programs and services offered (Exhibit # 19). The child protection agency has offered reasonable accommodations and service referrals to the parents sufficient to comply with the Americans With Disabilities Act. Indeed, under regulations promulgated under the ADA,28 C.F.R. § 35.130(e)(1), the regulations state as follows:
 "Nothing in this part will be construed to require an individual with a disability to accept an accommodation aid, service, opportunity or benefit provided under the ADA or this part which such individual chooses not to accept."
The DCF social workers cannot compel an adult to attend counseling or to benefit from services. The parent must be motivated to seek and benefit from treatment and the record is clear in this case that neither parent was sufficiently motivated to keep their scheduled appointments or complete substance abuse treatment. (See in particular, the narrative of Bruce Freedman, Ph.D. Exhibit # 20 page 2). CT Page 7898
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father was unable, due to his lack of personal initiative and maturity to have visitation or to benefit from reunification efforts. Mother's inability or unwillingness to address her multitude of personal problems, has prevented successful reunification efforts. The reunification efforts required the parents to obtain minimally acceptable parental qualifications including securing adequate housing, avoiding criminal activity, refraining from using illegal substances, and the like. The parents have failed to remain drug free and have no personal plan for the return of the child to their care. Dr Freedman indicates that Marilyn has a long recovery ahead, with strong chances of relapse and difficulty in establishing herself as an independent adult. Dr Freedman indicated that Jorge is completely unsuited for parenthood. He is emotionally immature and demanding and is presently drug-dependent.
3) The Department, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. There was only marginal compliance or participation by the parents. The parents have failed to complete recommended treatment and programs and continue to be impaired by drugs as recently as within ninety days of trial. The mother subverts her own treatment programs by using drugs while she is out on weekend passes. (Exhibit # 20)
4) The child has strong emotional ties with the relative foster family who has provided the physical, emotional and educational support this child needs. The child has no positive emotional ties to the father, whom she views as a friendly stranger (Exhibit # 20 p. 5). The mother has a limited relationship with the child which has been the source of confusion and distress to Natalia. The foster parents are viewed by the child as the "primary source of security and closeness."
5) Finding regarding the age of the child. Natalia is almost four years of age.[2] She deserves a permanent, structured, caring, nurturing environment that the relative foster parents are willing to permanently provide. Neither of the parents has offered the child a safe and secure home at this time or at any time in the past. CT Page 7899
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The parents have not made realistic and sustained efforts to conform their conduct to acceptable parental standards. Mother requires extensive therapy to deal with her substance abuse difficulties. While father has been incarcerated he has failed to take available substance abuse and parental programs offered for his personal rehabilitation. His failure to maintain a relationship with his child has displaced him as a possible parental figure. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C.210 Conn. 157 (1989); In re Juvenile Appeal 183 Conn. 11, 15 (1981).
7) Finding regarding the prevention of the parents from having a meaningful relationship etc.. The substance abuse and criminal behavior of the parents has resulted in their present situation. The Department attempted to encourage contact providing visitation scheduling and transportation. No unreasonable conduct is noted. The mother was offered regular visitation with the child but she has been inconsistent in her visitation opportunities.
In what appears to be a creative but desperate effort to thwart the unmistakable and very predictable outcome of these proceedings, the respondent mother, through counsel, has raised a novel defense. She maintains that "[T]he experience of entering the Middletown courthouse and being surrounded by all the artifacts, personnel and procedures in place there because of its use for criminal proceedings, intimidated her." As a consequence of her being intimidated she was unable ". . to assist her attorney, to put forward affirmative evidence, and to set tactical and substantive goals, was hampered by her reluctance to testify on her own behalf." The court finds this representation of counsel to be unsupported by any evidence whatsoever and wholly without legal precedence or merit.
 DISPOSITION
The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the child's best interest to terminate the parental rights of Marilyn and Jorge at this time. CT Page 7900 This finding is made after considering the child's sense of time, her need for a secure and permanent environment, the relationship that the child has with her foster parents, and the totality of circumstances that the termination of parental rights is in the child's best interest. In re Juvenile Appeal(Anonymous), supra, 177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of theChild 99 (1979).
 Order
It is accordingly, ORDERED that the parental rights of Marilyn A., and Jorge G. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Natalia G. A permanency plan shall be submitted within 90 days. A review Plan for Terminated Child shall be filed in accordance with Federal Law.
Francis J. Foley, Presiding Judge Child Protection Session
[2] The original neglect petition gives 8/9/94 as her date of birth. Exhibit #16 lists her date of birth as 5-26-94. The social study for TPR lists 8/4/94 as her date of birth.